THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR25-012-JHC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | TRAYTON BALLOT'S SENTENCING |
| | ) | MEMORANDUM |
| TRAYTON CHAZ BALLOT, | ) | |
| Defendant. | ) | |

"Whether you call it climate change or 'once-in-a-generation' extreme weather, no community in the wealthiest country on earth should lack the basic infrastructure needed to keep its people safe."

Alaskan Senator Lisa Murkowski thus criticized the federal government's most recent act of neglect towards the rural indigenous communities that Trayton Ballot calls home.[1] She was commenting specifically on an EPA grant that the Trump administration revoked five months before catastrophic floods and blizzards ripped through Alaska Native villages. But the federal government's neglect—often patronizing—is nothing new: many of these villages date "back a century, to when the U.S. government and Christian missionaries pressured tribes to abandon semi-nomadic customs and build permanent homes, churches and schools."[2]

---

[1] Maxine Joselow & Lisa Friedman, *Before Alaska Flooding, E.P.A. Canceled $20 Million Flood Protection Grant*, N.Y. Times (Oct. 14, 2025), https://www.nytimes.com/2025/10/14/climate/kupnik-alaska-typhoon-trump-epa-flood.html.
[2] Scott Dance, *An Alaskan Village Confronts Its Changing Climate: Rebuild or Relocate?*, N.Y. Times (Dec. 5, 2025), https://www.nytimes.com/2025/12/05/climate/an-alaskan-village-confronts-its-changing-climate-rebuild-or-relocate.html.

TRAYTON BALLOT'S SENTENCING MEMORANDUM
(*United States v. Ballot*, No. CR25-012-JHC) - 1

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

Trayton, meanwhile, sat in jail and learned of the devastation through phone calls with his family in his home village of Deering. As Alaska Natives do, the residents of Deering persevered against the odds without him. But they—and in particular Trayton's mom, who adopted him as a baby and is old enough to be his great grandmother—are eager for one of their youngest and hardest working men to return home. Ex. 1 (Bertha Ballot's video); Ex. 2 (combined letters).

The Court should therefore impose a sentence of time served of approximately five months and five years of supervision. And it should strike conditions of supervision—standard conditions 7, 8, and 10, and special conditions 3, 4, 5, and 6—that would effectively banish Trayton from Deering.

## I.   THE FEDERAL GOVERNMENT HAS SYSTEMATICALLY NEGLECTED INDIGENOUS COMMUNITIES LIKE DEERING.

Every community needs its young and hard-working people. But this is especially true for those that the federal government—which runs the wealthiest country on earth, as Senator Murkowski points out—has systematically neglected. The Court should not join in that neglect by depriving Deering of Trayton any longer.

Communities like Deering are rural, close-knit, and simple. Ex. 3 (video of Deering); Ex. 4 (picture of Trayton's family home). Like other Alaska Native villages, Deering is seasonally accessible by plane, boat, or ATV.[3] Deering residents rely on subsistence hunting and gathering. *See* Carlson, *supra* n.3, at 61. Alaska Natives lost many of their land rights and sovereignty to the federal government, which has not reciprocated with investment. "Inequitable regulatory barriers and program design have disadvantaged Alaska Native villages from relevant federal programs."[4]

---

[3] Kirsten Matoy Carlson, *Justice Beyond the State*, 41 Alaska L. Rev. 45, 89 (2024).

[4] *The Unmet Needs of Environmentally Threatened Alaska Native Villages*, Alaska Native Tribal Health Consortium (Jan. 2024) at 3, https://anthc.org/wp-content/uploads/2025/04/Unmet_Needs_Report_22JAN24-1.pdf.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, WA 98101**
**(206) 553-1100**

Due to this neglect, Deering is at severe risk of erosion, flooding, and thawing of permafrost.[5] Even among its peer villages, Deering's overall risk for this serious infrastructural damage is very high, ranking at 14 of over 115 villages. *Id.*

Trayton is an Alaska Native who steps in to fill the gap. He hunts not just for his family but for the entire village. Ex. 5 (combined pictures) at 2–10. He rescues stranded boats. *Id.* at 11–14. He helps build roads and other infrastructure. *Id.* at 15–18. He digs graves and carries caskets at funerals, even in the freezing cold. *Id.* at 19–21.

The federal government's neglect falls hardest on the same person who most needs Trayton: his elderly mom. She adopted him when he was a baby. In their Inupiat culture, "[a]doption is sometimes described as returning an older person, particularly a woman, to an earlier point in her life cycle, i.e., to the stage when she was bearing and caring for her own young children, or as placing a woman on the same generational level as her own daughters."[6] She and Trayton are very close and do not see their adoptive relationship in the prevailing Western cultural way: "adoption is not merely a transfer of custody between families; instead, the natal and adoptive families have continuing kinship ties with and obligations to one another." Wan, *supra* n.6, at 56–57.

Thus, returning Trayton to Deering is a necessary part of addressing the neglect of this Alaska Native village by the federal government.

## II.    THE FEDERAL GOVERNMENT'S NEGLECT HAS CREATED A JUSTICE GAP IN INDIGENOUS COMMUNITIES LIKE DEERING.

Imprisoning Trayton for more time or reflexively imposing conditions that effectively banish him from Deering would enlarge the justice gap in indigenous

---

[5] *Statewide Threat Assessment: Identification of Threats from Erosion, Flooding, and Thawing Permafrost in Remote Alaska Communities*, Denali Commission (Nov. 2019) at Table A-19 (PDF at 80), https://www.denali.gov/wp-content/uploads/2019/11/Statewide-Threat-Assessment-Final-Report-20-November-2019.pdf.

[6] Andrea V. W. Wan, *The Indian Child Welfare Act and iñupiat Customs: A Case Study of Conflicting Values, with Suggestions for Change*, 21 Alaska L. Rev. 43, 58 (2004).

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, WA 98101**
**(206) 553-1100**

communities. It would repeat the same mistake done time and again to them: "import[ing] institutions and procedures that are wholly foreign to Indian communities and that are not working in white communities either." Carlson, *supra* n.3, at 80 n.197.

When the federal government imposed the most recent Alaska Native governing structures in the late 1970s, it "restructured tribal relationships in Alaska by creating Alaska Native corporations to hold Native lands." *Id.* at 55. In turn, there was complete "extinguishment of Native land claims." *Id.* The federal government also established mandatory schools that "spread settler-colonist ideas by introducing Alaska Natives to Anglo-American laws, traditions, and cultures." *Id.* at 51. Trayton's mom was herself placed in one of these schools and victimized by this attempted indoctrination. Ultimately, these structures have not empowered Alaska Natives in the legal system: "Alaska Natives and Alaska Native Tribal governments have had relatively little say in the way crime and justice are addressed in their communities." *Id.* at 50.

Instead, there is a cultural mismatch where the federal government's preferred methods—adversarial justice, specific procedural protections for victims and defendants, lawyer-led advocacy, and so on—supplant Alaska Natives' own approaches. *Id.* at 48, 87 ("Our [tribal] judges solve problems by speaking directly to the people involved … professional attorneys have an approach that is aggressive and confrontational and is not appropriate for our court.").

It's easy for good intentions to overlook this reality. The Violence Against Women Act, for example, "requires that tribal governments provide specific procedural protections to a defendant in order to investigate, prosecute, convict, and sentence non-Native offenders for specific crimes. These protections are meant to ensure justice and fairness in an adversarial system, but they limit the ability of the tribal government to handle domestic violence situations in any other way." *Id.* at 84.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, WA 98101**
**(206) 553-1100**

Thus, good intentions in imposing standard punishments and protections can hurt everyone involved: "Consider a woman with a violent partner. The standard legal advice is for the woman to obtain a no-contact order or a personal protection order. Yet these orders seem nonsensical in a small, rural village of less than 300 people. In these communities, 'no contact' is virtually impossible due to the close proximity of housing and the lack of law enforcement to implement the order. … Instead, they continue to rely on informal ways to resolve their problems." *Id.* at 64.

As a result of this cultural mismatch and justice gap, public safety falters in Alaska Native communities. There are few domestic violence shelters, one in three communities has no law enforcement, and there are high rates of violence, substance abuse, and suicide. *Id.* at 61–62. The justice gap is tragically apparent in MV2's case. MV2 and her family approached law enforcement, who did a forensic interview of her and also interviewed Trayton. The case never went to prosecution—only a protection order. Perhaps after Trayton left the village, MV2 was satisfied per her cultural understanding of justice. Or perhaps MV2 lacked access to "[t]he state courthouse, [which] has essentially become a symbol of oppression for many Native people in Alaska." *Id.* at 50. Ultimately, MV2 was brought to a Seattle federal courthouse to testify not for her own case, but the case of a young white woman.

Moreover, "[e]mpirical studies have found that cultural mismatch undermines governmental stability and thwarts economic development in Native communities." *Id.* at 82. For example, the mismatch of imprisoning hardworking young men like Trayton takes his labor away from a community like Deering that desperately needs it.

To the same end, the Court should not impose standard conditions 7, 8, and 10, and special conditions 3, 4, 5, and 6, because they would effectively banish Trayton from Deering. Employment in Deering is seasonal and ad hoc (standard condition 7). Deering is a tight-knit community where everyone knows and interacts with everyone

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, WA 98101**
**(206) 553-1100**

1  else, regardless of their criminal history (standard condition 8). Trayton, like many in

2  Deering, is a subsistence hunter (standard condition 10). And again, Deering is tight-

3  knit, a place where neighbors rely on each other for everything, including childcare, and

4  is a very small area (special conditions 3–6).

5  ## III.    THE VULNERABLE VICTIM ADJUSTMENT DOES NOT APPLY.

6      After the PSR objection deadline, the government said it would ask for the

7  vulnerable victim adjustment, citing *United States v. Wetchie*, 207 F.3d 632 (9th Cir.

8  2000). The court there found no clear error in applying the adjustment due to three

9  facts: the victim was sleeping and thus unable to react or defend herself; the defendant

10  had access to sleeping victims through his job; and the defendant reasonably could have

11  anticipated this vulnerability. *Id.* at 634–35. Trayton's case has none of these facts.

12      First, MV1 alleged four instances of touching (the fourth was not completed).

13  She said she was asleep for the first two but not the latter two. Because the verdict form

14  did not specify each instance, it's unclear on which instance(s) the jury convicted

15  Trayton. The jury could have believed one or more of the instances—spread out over a

16  four hour flight—were an accident or simple assault (per the defense theory). In

17  *Wetchie*, there was only one instance of touching. 207 F.3d at 633. But here, because

18  there were multiple instances, MV1 was awake for some of them, and the jury did not

19  specify which it was convicting on, there is insufficient evidence that MV1 was asleep

20  when intentionally touched beyond simple assault.

21      Second, MV1 and Trayton were both commercial airline passengers. If anything,

22  he had less status on the plane: she was with family while he was alone, and she was a

23  normal passenger while he was on a non-revenue ticket.

24      Third, MV1 could have and in fact did ask for help from her friend and family,

25  and removed herself from the situation. For any of these three reasons, the vulnerable

26  victim adjustment does not apply.

TRAYTON BALLOT'S SENTENCING MEMORANDUM
(*United States v. Ballot*, No. CR25-012-JHC) - 6

In conclusion, while the jury found Trayton guilty of sexual abuse, it did not make—nor did the government ask for—any specific findings. The jury also did not find anything as to MV2. Trayton has served five months in jail and, considering that more time or reflexively imposed conditions would increase the justice gap in Deering, the Court should send Trayton home.

DATED this 28th day of January 2026.

Respectfully submitted,

s/ *Mukund Rathi*
Assistant Federal Public Defender
Attorney for Trayton Chaz Ballot

TRAYTON BALLOT'S SENTENCING MEMORANDUM
(*United States v. Ballot*, No. CR25-012-JHC) - 7